UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-377-M-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | UNITED STATES' |
| v. | ) | SENTENCING MEMORANDUM |
| | ) | |
| JESSE JAMES FREEMAN | ) | |

The United States of America, by and through United States Attorney for the Eastern District of North Carolina and the Assistant Attorney General for the Environment and Natural Resources Division, hereby submits this sentencing memorandum to aid the Court in its resolution of Defendant Jesse James Freeman's objections to the Presentence Investigation Report and in its selection of an appropriate sentence, taking into consideration the relevant factors under 18 U.S.C. § 3553 and any departure motion that the government may file.

I.  BACKGROUND

The Presentence Investigation Report ("PSR") sets forth in detail the offense conduct in this case. (*See* PSR at 7-16). By way of summary, Freeman played an active role in a domestic and international turtle smuggling scheme. Freeman unlawfully collected, and caused to be collected, turtles from North Carolina and South Carolina. Freeman then inhumanely packaged the turtles into socks to prevent authorities from hearing them scratch at the box and to absorb urine and feces. Freeman would

1

then ship the turtles through FedEx to a middleman. The middleman in turn shipped the turtles to the end buyer in China, Kang Juntao, who would sell the smuggled turtles to Asian consumers. Freeman knew Kang based on a prior business relationship. Freeman also knew that Kang, and others like him, sold trafficked turtles for at least $1,200 each. The following exchange took place between an undercover officer and Freeman during the investigation, after Freeman told the undercover officer that box turtles are "where the money is at:"

> UC Officer: "well what the hell do they do with them; I mean they don't eat them damn things do they?"
>
> Freeman: "they keep them for, hell no, I got a buddy that I'm real close with, a Chinese guy, and he told me (inaudible) he said it's illegal to take them out of the United States. You can ship them inside all you want to its legal, but you can't take them outside the United States. Same thing with these, you can't take them out without CITES paperwork. You got to have the paperwork for them, and they don't have that, and they ain't going to try to get it because then they got to prove where the turtles came from, and they are buying them from people like us and they can't prove it so they're fucked. So what they do is they smuggle them out. They put them in socks, and they put them in little cups, and they put them in kid's toys and stuff and ship them overnight. Or they put them in a humongous shipment of stuff where they can't search everything, and then they ship them overnight. **When a box turtle, when he buys it from me at 125 dollars, it hits the market in China, its 1200 dollars. The same turtle, that's the mark up on it going from here to there.** People are paying that for them and they are paying the premium for the prettier ones, because they want them to put in their garden, they say they got to have a turtle in their garden or the garden won't be prosperous. They are real, real damn superstitious over there, they love them damn baby turtles. So they buy them, and they buy as many as I can get, and I run out every year.

(May 3, 2018 conversation between Freeman and Lt. Phillip Lucas, North Carolina Wildlife Resource Commission, Special Investigation Unit) (emphasis added).

Freeman went on to brag to the officer that he was going to pay off his house "with turtles," and that he made more money on turtles than he ever had doing cabinet work. *Id.* The reason he made so much money is because the demand is Asia was so strong and the retail market value was much more than $1,200, making the illegal smuggling activities worth the risk to all of the conspirators in the scheme.

In fact, Asian consumers have been and remain willing to pay a significant amount of money for Eastern Box Turtles. A search on Facebook marketplace revealed Eastern Box Turtles being offered at prices ranging between $1,575 and $3,975 (based on the 2018 US-Chinese Yen exchange rate). A few posts are set forth below:





In addition, Freeman's co-conspirator, Kang, told law enforcement that some female Eastern Box Turtles with rare markings are worth as much as $20,000. Another co-conspirator, Chu Sen Guan, wrote in an electronic communication that some Eastern Box Turtles sell for 20,000 Chinese Yen, which equates to $3,000. In 2019, prized box turtle hatchlings were selling for 60,000 to 80,000 yuan or about $8,571 to $11,428 based upon currency rates at the time. "Exotic species get claws into pet market," China Daily (Aug. 22, 2019). An average of these retail market prices is several thousand dollars, well above the retail market price used in the PSR's guidelines calculations in Freeman's case.

II. Guidelines Calculation

Defendant raises two challenges to the guidelines calculations, contending that the PSR uses the wrong retail market value and that he did not willfully obstruct the investigation. (*See* PSR at Addendum). For the reasons set forth below, the United States contends that the probation officer properly calculated Defendant's advisory guidelines range of 46 to 57 months' imprisonment.

    A.    The PSR properly used the retail market value in Asia for purposes of calculating Freeman's guidelines range.

Freeman does not challenge that the fair market value in Asia for the smuggled turtles exceeded $1.5 million. Rather, he argues that the market value for purposes of the guidelines calculations should be what he was paid for the turtle in North Carolina. (*See* PSR at Addendum ¶1.). Freeman's argument ignores the plain language of the guidelines.

The applicable sentencing guideline, USSG §2Q2.1, provides, in relevant part,

6

that "[i]f the market value of the fish, wildlife, or plants . . .exceeded $6,500, increase by the number of levels from the table in §2B1.1." USSG §2Q2.1(b)(3)(4) Application Note 4 explains that "when information is reasonably available, 'market value' under subsection (b)(3)(4) shall be based on the fair-market retail price."

In the present case, Freeman knew that the turtles would be smuggled out of the United States and to China where his co-conspirators, including Kang, would sell them to Asian buyers. Asia is the retail market. Therefore, it is proper to use the fair-market value of the turtles in Asia.

The Fourth Circuit rejected a similar argument in *United States v. Dove*, 247 F.3d 152, 159 (4th Cir. 2001) (*vacated and remanded on other grounds)*. In that case, the defendant appealed the district court's use of the highest price paid by the ultimate consumer to establish the retail market value for purposes of his guidelines calculation. The Fourth Circuit found no error. *Id.*

In a similar fact pattern, a defendant was convicted in Las Vegas of selling rhinoceros horn in violation of the Lacey Act. *United States v. Edward Levine*, 2:14-cr-127. The district court rejected the defendant's argument that it was limited to the U.S. sale price where reliable evidence showed the true market was in China. The Ninth Circuit affirmed, stating:

> The district court found that it was reasonable to use the Asian retail market… based on the government's evidence including 'various documentation provided by other well-known publications, as well as the agent's testimony.' In doing so, the district court was not limited to the United States' auction market, as [the defendant] contends, but could reasonably rely on evidence showing a relevant Asian market.

*United States v. Edward Levine*, No. 18-10110 (9th Cir. 2018)(mem.).

7

Freeman's argument also undermines deterrence of wildlife trafficking. The reason individuals engage in export smuggling is because a good is relatively cheap in the United States and relatively expensive abroad. The more expensive an item is abroad, the more tempting it will be to smuggle the good, and the more deterrence is necessary to prevent such smuggling. Basing the guidelines on the market price at the destination thus properly aligns higher deterrence with higher profit. Under the Freeman's theory, by contrast, punishment would be based on the cost of the goods in the United States, a factor with no relevance to culpability or deterrence.

Accordingly, the Court should overrule Freeman's objection and find that the PSR properly applies the 16-level enhancement for a retail market value in excess of $1.5 million.

> B. The PSR properly included a 2-level enhancement for obstruction of justice pursuant to USSG §3C1.1.

The guidelines permit an enhancement where the defendant willfully obstructed or attempted to impede the administration of justice relating to the instant offense. USSG §3C1.1. Freeman does not deny that (1) upon learning that agents were executing a search warrant at his home, he threw his cellphone in a river; (2) that he did so because he knew from other turtle investigations law enforcement seeks warrants on cellphones; (3) and there was information on his phone that he did not want law enforcement to see. *(See* PSR at Addendum). Rather, he simply asserts that he cooperated when he returned to his home, and therefore, he did not willfully obstruction justice.

Freeman, however, destroyed evidence that was material to the investigation. He subsequently bought a temporary cell phone to use.

Freeman also provided a stream of false statements to USFWS agents to thwart their investigation, even after agents warned him that it was a crime to knowingly provide false information. He falsely said that he purchased the turtles from a reptile show in San Antonio or lawfully collected them in South Carolina. He claimed that he did not know who else collected turtles or purchased them in North Carolina, even while employing six to eight poachers in central North Carolina. He also falsely labeled his packages containing turtles with incorrect species information to give the appearance that they were not native to North Carolina.

The guidelines include a non-exhaustive list of examples of obstruction, including destroying evidence and producing false records. USSG §3C1.1 n4(C)(D). Accordingly, the PSR properly applies a 2-level enhancement for obstruction of justice.

III. The Relevant §3553(a) Factors

The government submits that a sentence of incarceration is warranted in this case based upon the applicable §3553(a) factors.

    A.    The nature and circumstances of the offense conduct weigh in favor of a sentence of incarceration.

Freeman trafficked in Eastern Box Turtles and Spotted Turtles. The Eastern Box Turtle (*Terrapene carolina carolina*) is a subspecies of the common box turtle (*Terrapene carolina*), listed in Appendix II, and has been North Carolina's state reptile since 1979. NC Gen. Stat. § 145-9. The Eastern Box Turtle is native to forested

9

regions of the eastern United States with some isolated populations in the Midwest. The turtles have a domed carapace which can display radiated lines or spots. Turtles with colorful markings are particularly prized in the domestic and foreign pet trade.



The Spotted Turtle (*Clemmys guttata*) is also listed in Appendix II. Spotted turtles are small aquatic turtles that are black in color with yellow spots. The species is found in the coastal region of North Carolina.



10

There is a web of state, federal and international laws that regulate the trade in these turtles. As described in the Criminal Information, the multilateral treaty called the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") protects both species of turtles. 27 U.S.T. 1087, T.I.A.S. 8249. The United States, China, and approximately 181 other countries are signatories to the treaty. CITES provides a mechanism for regulating international trade in species whose survival is considered threatened by trade. The turtles are listed in Appendix II of CITES, which includes wildlife, fish, and plant species that are not presently threatened with extinction but may become so if their trade is not regulated. Under Appendix II of CITES, a species may be exported from a country only if, prior to exportation, the exporter applies for and obtains a valid CITES export permit issued by the country of export. Freeman and his co-conspirator buyer did not apply for any of the necessary permits, and USFWS would not have granted them for the commercial pet trade.

With good reason, CITES is one way the international community attempts to stem the illegal collection of turtles. Poaching is a threat to the survivability of many turtle species and is "the second largest threat for reptile species worldwide. Among reptiles, turtles and tortoises represent the most threatened group of vertebrates worldwide." *A Short Review of the International Trade of Wild Tortoises and Freshwater Turtles Across the World and Throughout Two Decades*, L. Luiselli, et al., <u>Chelonian Conservation and Biology</u> Vol. 15, No. 2 (2016). The United States is the

second-largest exporter of protected turtles and the largest importer. Id. The trade of turtles protected by CITES "has grown tremendously over the years, increasing over about 2 decades from about 50,000 to over 150,000 individuals annually traded… [including in] 2011-2014, an average of 138,000 live wild-collected CITES-listed tortoises and freshwater turtles per year." Id.

The underground wildlife trade is lucrative and rivals better-known criminal activities. "The illegal aspect of wildlife trade is estimated to be a $5-20 billion dollar industry, comparable to the international trade of narcotics and weapons." *Summarizing US Wildlife Trade with an Eye Toward Assessing the Risk of Infectious Disease Introduction*, K.M. Smith, et al., EcoHealth (2017). It is surprising to many that reptiles in particular are trafficked in such large volumes. A 2018 study of the wildlife trade from Europe found that "reptiles were by far the most numerous protected specimens identified, with live tortoises and turtles, in particular, representing 45% of specimens." *Disrupt: Wildlife Cybercrime*, Jo Hastie, International Fund for Animal Welfare (May 2018). Elephant ivory by comparison represented 11 percent of this illegal market. Id.

In addition to demand from traditional medicine, these turtles are coveted by many in China as pets. "[W]ith newfound wealth in the region… turtles are just another rare, coveted item to collect, like wine, fine art, and cars. Demand has already wiped out large numbers of native turtles in Asia, making American turtles even more attractive." *Turtles are being snatched from the U.S. waters and illegally shipped to Asia*, Dina Fine Maron, National Geographic (October 28, 2019). Turtles

are particularly vulnerable to poaching given how late they reach sexual maturity, the low survival rate of eggs and hatchlings, and environmental pressures from climate change, vehicle traffic, and habitat loss. "Because popularly targeted adult species can take five years or more to reach reproductive age, drawing down adult populations for the pet market could cause a species to collapse quickly – perhaps even before biologists and law enforcement become fully aware of the problem." Id.

Freeman sought to profit from this demand for turtles. Within 21 months, Freeman trafficked 722 Eastern Box Turtles, 122 Spotted Turtles, and three Wood Turtles, another CITES II listed species. (PSR at ¶¶13-16). Freeman personally received at least $121,748.16 in payment for those turtles. (PSR at ¶17). The market value for those turtles exceeded $1,523,300.

B. The defendant's history and characteristics weigh in favor of a sentence of incarceration.

Although Freeman stands before the Court with the favorable criminal history category of I, his conduct was not isolated nor was it aberrant. In fact, even after the search warrant and being interviewed by law enforcement in May 2018, Freeman continued to smuggle turtles out of the United States. (PSR at ¶ 12). He used an alias, Chris Bullins, and even a fake address for shipping purposes. (PSR at ¶12).

C. The sentencing goals of deterrence weigh in favor of a sentence of incarceration.

A sentence of incarceration will "promote respect for the law," "provide just punishment," 18 U.S.C. § 3553(a)(2)(A), and "afford adequate deterrence to criminal conduct" by Freeman and other potential offenders. Id. § 3553(a)(2)(B); see Goff, 501

13

F.3d at 258, 261. Even if this Court could be sure that Defendant will not resume his criminal activities, a sentence of incarceration is needed "to afford adequate deterrence to criminal conduct" by other potential offenders. 18 U.S.C. § 3553(a)(2)(B); see Goff, 501 F.3d at 258, 261. In this case, the Court has the rare opportunity to sentence the individual who is directly responsible and has directly profited from turtle trafficking. "[I]t is rarely the trade coordinator who is held accountable. Historically it has been the low-level couriers who are apprehended, and prosecutions are uncommon, which provides little meaningful deterrence or impact on the proliferation of the trade itself." Operation Dragon: Revealing new evidence of the scale of corruption and trafficking in the turtle and tortoise trade, S. Stoner. *Wildlife Justice Commission* (Dec. 2018).

By sentencing Freeman to a term of imprisonment, the Court will send a message to those who sell or intend to engage in wildlife trafficking that doing so will result in significant and meaningful penalties. These consequences serve as a counterbalance to the significant profits that traffickers and their co-conspirators make by smuggling wildlife and force them to give more consideration to the risk and consequences associated with violating U.S. law, even if they operate from a foreign nation.

Imposition of a sentence of incarceration is likely to have a significant deterrent effect on the individuals that comprise the legitimate and illegal turtle markets in the United States and Asia. The community is interconnected, and the consequences faced by Freeman will certainly be learned of by other potential

14

Case 5:20-cr-00377-M   Document 33   Filed 05/18/22   Page 14 of 18

traffickers. Similarly, the niche nature of the market means that the impact of such a deterrent effect on turtle trafficking as a whole will be significant. Imposition of asentence of imprisonment will alert other individuals who may be tempted to engage in behavior similar to Freeman's that such conduct will be punished.

D. A sentence of incarceration avoids unwarranted sentencing disparities.

Finally, a sentence of incarceration avoids unwarranted sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." Rita, 551 U.S. at 349 (internal quotation marks omitted). Even after Booker, "uniformity remains an important goal of sentencing." Kimbrough, 552 U.S. at 107. The Guidelines "help to avoid excessive sentencing disparities," id. (internal quotation marks omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," Gall, 552 U.S. at 54, and because most defendants are sentenced within the Guideline Ranges, see Peugh, 569 U.S. at 542.

Reptiles are regular victims of the wildlife trafficking trade. In the past 10 years alone, there have been at least 135 Lacey Act convictions for selling or falsely labeling turtles and tortoises alone. A sentence of incarceration would be consistent with sentences imposed on defendants who engaged in conduct similar to Freeman's crime, even taking into account any departure motion that the government may file in this case. For example:

15

- In United States v. Kang Juntao, No. 1:19-cr-107, D. NJ, the defendant purchased turtles from Freeman and had them smuggled to Hong Kong. The court sentenced him to 38 months imprisonment on a money laundering charge following his extradition from Malaysia.

- In United States v. Ashtyn Rance, No. 7:21-cr-5, M.D. Ga., the court sentenced the defendant to 33 months imprisonment for shipping eastern box turtles and vipers from Georgia to Florida. The sentence ran concurrent to a charge of possessing a firearm by a felon.

- In United States v. Travis Leger et al., No. 1:17-cr-40, E.D. Tex., the defendants conspired to illegally take alligator snapping turtles in Texas and sell them in Louisiana. Two of the defendants were sentenced to 21 months' and 16 months' incarceration respectively for violating the Lacey Act, along with $22,431 restitution to the State of Texas.

- In United States v. Keith Cantore, No. 2:14-cr-197, E.D. La., the defendant, who had a previous conviction for selling turtles, received a sentence of 41 months' incarceration and $42,805 in restitution for purchasing wood turtles in violation of the Lacey Act.

- In another case from the Eastern District of Louisiana, United States v. Lawrence Treigle, No. 2:14-cr-181, the defendant, along with his co-conspirators, captured protected wood turtles from Pennsylvania and shipped them to Hong Kong using false labels, earning in excess of $200,000. Treigle pleaded guilty to conspiracy to violate the Lacey Act and was sentenced to 15 months' incarceration and two years of supervised release.

- In a case involving New Jersey, David Sommers poached female diamondback terrapins and their eggs from the shore and sold them in violation of the Lacey Act. The court sentenced him to six months' incarceration, three years of supervised release, and $250,000 in restitution to New Jersey. United States v. David Sommers, No. 2:18-cr-290, E.D. Pa.

- In United States v. Yuchao Fang, 5:17-cr-40107 and 5:18-cr-40042, D. Kan., the defendant was sentenced to 60 months' incarceration for possession of child pornography and conspiracy to commit smuggle turtles to Freeman's customer, Kang Juntao, and Lacey Act violations.

- In United States v. Haixi Sheng, 1:18-cr-151, M.D.Pa, the defendant received a sentence of one year and one days' incarceration for smuggling turtles from the United States to Hong Kong for Kang Juntao.

16

WHEREFORE, the Court should reject Freeman's objections to the PSR, determine that the Probation Officer properly calculated the advisory guidelines, and fashion a sentence of incarceration based upon the §3553(a) factors, taking into account any motion by the government.

Respectfully submitted this 18th day of May, 2022.

| | |
|---|---|
| MICHAEL F. EASLEY, JR.<br>United States Attorney | TODD KIM<br>Assistant Attorney General<br>Environment and Natural Resources Division |
| */s/ Toby Lathan*<br>By: TOBY LATHAN<br>Assistant United States Attorney<br>Criminal Division<br>150 Fayetteville Street, Suite 2100<br>Raleigh, NC 27601<br>Telephone: (919)-856-4274<br>Facsimile: (919) 856-4828<br>E-mail: TLathan@usa.doj.gov<br>NC Bar No. 35398 | /s/ *Banumathi Rangarajan*<br>By: BANUMATHI RANGARAJAN<br>Trial Attorney<br>Environmental Crimes Section<br>4 Constitution Square<br>150 M. St., NE, Rm 4.211<br>Washington, DC 20002<br>Telephone: (202) 305-0458<br>Fascimile: (202) 514-8865<br>Email: banu.rangarajan@usdoj.gov<br>NC Bar No. 27311<br><br>/s/ *Ryan Connors*<br>By: RYAN CONNORS<br>Trial Attorney<br>Environmental Crimes Section<br>4 Constitution Square<br>150 M. St., NE, Rm 4.132<br>Washington, DC 20002<br>Telephone: (202) 305-0363<br>Fascimile: (202) 514-8865<br>Email: ryan.connors@usdoj.gov<br>NY Bar No. 4404901 |

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of May 2022, a true and correct copy of the foregoing was furnished via messenger delivery to counsel for the Defendant, addressed as follows:

Diana Pereira
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601

/s/ *Banumathi Rangarajan*
BANUMATHI RANGARAJAN
Trial Attorney
Environmental Crimes Section
4 Constitution Square
150 M. St., NE, Rm 4.211
Washington, DC 20002
Telephone: (202) 305-0458
Fascimile: (202) 514-8865
Email: banu.rangarajan@usdoj.gov
NC Bar No. 27311

*/s/ Toby Lathan*
By: TOBY LATHAN
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919)-856-4274
Facsimile: (919) 856-4828
E-mail: TLathan@usa.doj.gov
NC Bar No. 35398

18

Case 5:20-cr-00377-M    Document 33    Filed 05/18/22    Page 18 of 18